Good morning, ladies and gentlemen. As you have no doubt noticed, Judge O'Malley is not here due to a recent injury, but she is listening in and watching us, and she'll fully participate in the decision of the case. We have six cases this morning, five patent cases, either from the PTAB or from the district court, and a case from the Court of Federal Claims, which is not being argued and will be submitted on the briefs. We're going to hear three arguments and then take a short break and then return for Dr. Falk and Salix. Our first case is Amgen v. Sandoz, 2018-1551-1552. Mr. Groombridge. Good morning, Your Honors, and may it please the Court. So I want to start with the 878 patent, and we have two categories of complaints about what happened in the district court there. First of all, that the district court made errors of claim construction, and secondly, that the district court disregarded the evidence that we submitted, principally the declaration of our expert, Dr. Wilson. And while I'm going to focus largely on the claim construction issues, I want to lay out at the beginning in summary form what it was that Dr. Wilson showed. He went through in great detail. Isn't the first basic question whether Walsh precedes Ellucian? That's the first claim construction question, absolutely, Your Honor. And the dispute there boils down to does that mean that at any given point in the column, Walsh precedes Ellucian, or does it mean that everywhere in the column, all Walshing must be finished before any Ellucian starts? Well, the claims don't get into that kind of detail. They do talk about supplying a refold solution and then Walshing and then Ellucian, and that's what the specification says. Walsh and then after that, you elute. And why isn't it as simple as that? And the reason, Your Honor, why it is at any given point in the column absolutely as simple as that. But remember, the column takes the material a certain amount of time. Let's say 10 minutes, that's in Dr. Wilson's declaration, from the time it enters at the top to the time it exits at the bottom. And there is no reason whatsoever why Walshing cannot be occurring at the bottom of the column when Ellucian starts at the top of the column. So if we look at any given place, Walshing precedes Ellucian. And what that means is we avoid commingling. But there is absolutely no requirement that all Walshing be finished everywhere before any Ellucian start anywhere. That's simply not necessary. And, in fact, the patent teaches to the contrary in Example 3. Now, the only reason that was ever given by the district court or by Sandoz for Walshing having to be finished before eluting takes place. The court reasoned that the washing and eluting steps occurred simultaneously because if that didn't happen, then the proteins that separate during the washing would bind again. Was the court wrong on that? I don't think the court's wrong if you look at any given place in the column. In other words, I think that the problem with the construction is it's ambiguous as to whether we're talking about a particular spot in the column or everything that's happening across the column at all. And so the court's completely right, and there was never any disagreement, that, of course, we have to wash before we elute. If we did the two at the same time, everything would come out and there would be no separation. But what is going on, and this is illustrated by the diagram that's on page 3 of the Gray Brief, not that I want us to go there, but it shows the only reason that was ever advanced for the temporal separation was to avoid co-mingling. Well, we can avoid co-mingling as long as we say that we're talking only about a specific spot in the column. Putting co-mingling aside, you do agree you have to wash before you elute? Absolutely, and we never disputed that in any way. And would you agree that those are two distinct steps? At any point in the column, they're two distinct steps. So, first of all, you wash. I mean, think about this, it's logical. The molecule of interest here, full grasp, confines to the column. And let's imagine we're talking now just to the specific place. And then there's wash, which means fluid comes by and sweeps away the things we don't want so they can emerge out of the bottom of the column and be discarded. So what's the issue? If you agree that they're separate steps and that washing precedes elution, what's the issue? So our expert says at any point in the column, washing does precede eluting. The district court then said, well, that wasn't what I meant. When I said after, I meant all washing has to be finished before any eluting starts. You're nitpicking the district court. The question is, was the judgment correct? The judgment was wrong because what's going on, as our expert showed, what their process does is exactly what's claimed in this patent. The judgment's wrong. And our expert showed, full grasp comes in, binds to the column, fluid comes by, carries away contaminants. You're saying they have separate washing and elution steps. Absolutely. When you look at any given point in the column, absolutely, Your Honor. Full grasp in binds. Fluid passes down the column, carrying away contaminants that are discarded, never again to be mixed with the desired substance. The conditions change. The full grasp releases from the column, comes down to the bottom, and is collected. That's exactly what this patent is talking about. And our expert laid that out in tremendous detail, and the district court simply disregarded it. That's the fundamental problem that we have here. And there's paragraph after paragraph in which our expert goes through and talks about, explains why it is that full grasp in binds, why it is that specific contaminants don't bind and are swept away, why it is that the conditions change, the salt concentration increases, the full grasp in lets go, comes out and is collected. It lays it out in graphic detail. The district court's comment on that was you're just at one sentence. You're attempting to redefine Sandoz's process. We're not redefining it. We're analyzing it, analyzing it in tremendous detail. And that was wrong. And so the claim construction, to the extent that after means, as it must have meant, as the district court said it meant for this judgment, after means all washing must be finished before any eluting begins, that's wrong. To the extent it means at any given point in the column, washing precedes eluting, it's right. But our evidence shows that that's exactly what happens. Well, putting that aside, just looking at the patent itself, at F, washing the separation matrix and eluting the protein from the separation matrix, that seems to just read in plain English that you first have to have, you first have to wash the separation mix. It's logical. You have to wash the separation mix before you get into the eluting process. And that's exactly what happens, Your Honor. In other words, what our expert said is the filbrastim attaches to these beads. Then fluid comes, and while it's attached, fluid comes by that doesn't cause it to unattach, sweeps away the things that aren't wanted. Then the salt concentration goes up. That causes the filbrastim to release from the bead and be swept out of the bottom. That is eluting. And so what is happening here is that Sandoz is doing exactly what this patent talks about. It is having the filbrastim attached to the column, have unwanted contaminants not attached come out of the bottom, be disposed of, and then have the filbrastim come out afterwards because it's eluted and be collected. The district court said the method employed by Sandoz does not have the sequential washing and eluting steps required by Claim 7. It entails continuously pumping a refold solution. And I think, Your Honor, that gets into the second of our disputes, which is about whether it is required to form a discrete washing solution outside the column and then put it in, and whether after that it's required to form a discrete eluting solution and put that in. And that's what the district court is saying there. Our expert said compositionally distinct washing and eluting solutions form inside the column in situ and form the functions that are laid out in this patent. And it's not that three separate solutions are made at the beginning and put one after another into the column, but they form in there and they carry out the teaching of this patent. The district court then said, and this is what I take to be the dispute, I think you only infringe this patent if you form a washing solution that's separate from the refold mixture and put it in, and then after that you form a different eluting solution that's separate from the mixture and put it in. And our view is that that's incorrect. There's nothing in the patent that requires that. The patent only requires that once the filgrastim, once the molecule of interest is attached, that there be a washing in the sense that fluid carries away unwanted things. What about the 427 patent? I'm happy to talk about that, Your Honor. In the 427 patent, again, we think there's an error of claim construction and we think that the term is disease treating effective amount. The question is whether the term disease treating requires this agent, which the patent defines as the chemotherapeutic agent, to be prescribed for treating, let's say, cancer as opposed to the treatment, as opposed to for the purpose of mobilizing stem cells. Are you saying that if there were no chemo agent, the claim would still make sense, that treating a disease would be sufficient by administering the GCSF? Excuse me, my congestion. No worries. What we're saying, Your Honor, is that the term disease treating effective amount is an adjectival phrase that says this is how much you apply. It's a what kind of phrase? It's an adjectival phrase. In other words, disease treating and effective here modify amount. And all this is doing is this is how much you administer. It's not saying why you administer it. In other words, disease treating doesn't mean that this must be administered for the purpose of killing cancer cells. The patent is very clear that... That doesn't seem to make a lot of sense. That's why you're doing the treatment. Can I take a run at that, Your Honor? What the patent is saying is it starts... Because the way the claim was construed, it reads on what the patent describes in column one as a prior art. And in our view, that can't possibly be right. And so the patent says, look, we know that when you treat certain diseases with high-dose chemotherapy or radiation, as part of that treatment, the treatment itself requires subsequent incorporation of hematopoietic stem cells. That's column one, lines 18 to 20. So part of the treatment is the stem cell collection, harvesting, and re-administration. And the patent then says, we know, it's known in the art, that one of the ways you can mobilize the stem cells is by administering GCSF. And it also says that then you could do that, harvest the stem cells, and then treat the cancer by giving chemotherapy. That's part of the prior art. The claim was construed to read on that description of the prior art. What the patent says, and frankly, it's hard for us to see how anyone could reach a contrary conclusion. When you read the patent, it says, our invention is the discovery that when you're trying to mobilize the stem cells, if you first give the GCSF, and then you give a chemotherapeutic agent, and then you harvest the stem cells, you get a much better result. You get a better yield of stem cells. And then you can go on to treat the cancer. You could treat it with chemotherapy. You could treat it with radiation, which case there would never be a chemotherapeutic drug used for treatment of the cancer. When the claim uses the word diseases, what diseases is it talking about? In the preamble, Your Honor. I think what it's talking about in the preamble, when it says a method of treating a disease requiring peripheral stem cell transplantation, I think what it's talking about is a method such as the use of high-dose chemotherapy or radiation. What diseases is it talking about? Typically cancer, but the patent is not so limited, and there may very well be others. But the classic case would be if someone has cancer, and there are certain methods of treatment that will kill all of the stem cells in the bone marrow, and therefore the patient will die if there is not a re-transplantation. And therefore the method of treatment requires this peripheral stem cell transplantation, and that's what I take the claim to be talking about. Do you want to save a couple of minutes for rebuttal? Absolutely, Your Honor. We'll save it for you. Thank you. Ms. Maynard. Good morning, Your Honors. May it please the Court, Dan Maynard on behalf of Sandoz. The district court correctly concluded that Sandoz's one-step, one-solution process does not infringe Amgen's three-step, three-solution method. And there's at least three independent ways this court could affirm, and the first is Amgen should not be allowed to make its claim construction arguments in this court. It strategically chose not to respond to the claim construction arguments during the claim construction proceedings in the district court. The district court concluded it made no response, and Sandoz expressly teed up the question of separate steps, that the washing step had to be separate from the eluding step, and the district court agreed with us. At A46, the district court held the steps cannot occur simultaneously. And then at summary judgment, contrary to the premise of Amgen's appeal brief here, at summary judgment, the district court applied that construction and held that Sandoz's one-step, one-solution process, whereas Your Honor mentioned it's just a matter of continuously applying refold solution, does not practice the claims as interpreted by the claim construction order. So under this court's precedent, that should be the end of this appeal. Amgen did not press its claim construction arguments at the proper time, and it shouldn't be allowed to come to this court and contend that the district court made an error. But on the merits? On the merits, Your Honor, the claim construction is correct. So if one looks at the claim constructions that aren't challenged, the step of washing the separation matrix was interpreted to mean, and this is at Appendix 44 to 45, carryover, adding a solution to the separation matrix to remove materials in the refold solution while preserving binding of the protein to be purified. Adding a solution to remove materials from the refold solution. So just by definition, that has to be a different solution than the refold solution while preserving binding of the protein. And then the next step, the next step is applying a solution. Applying a solution. And that step must come after the step of adding a solution to wash. And where are you? I'm reading the claim constructions for washing, which is at Appendix 44 to 45 at the bottom, Your Honor. So it's a carryover. In sum, the phrase must be construed, and it adopts part of, the judge adopts part of Amgen's proposal and part of Sanders' proposal for the washing step. But the key point, Judge Lurie, is that the focus on the washing step is adding the solution. Adding the solution. And only after you add the solution and all of the washing solution, because the step can't occur simultaneously with the eluding solution. The eluding solution, applying the eluding solution occurs after and is a separate step. Well, that's what the patent says. That's what the patent says, exactly. Now, what about Example 3? So Example 3 is not inconsistent with that construction, Your Honor. So Example 3 includes adding a refold solution. Then adding, so we're on A76 in, let me see, let me, sorry, I beg your pardon. A76, Column 20, Line 34. So starting up at Line 27, the refold solution is added. And then picking up at Line 34 on Column 20. After loading the refold solution, the column was washed. And then it gives the components of that first washing solution. Then it was washed with an additional washing solution. It gives components for a different washing solution. The protein of interest was recovered from the resin by gradient elution. And then it talks about a third solution. That third solution is the eluding solution, Judge Lurie, and it contains salt. And it is a separate solution. It's completely consistent both with the separate solutions construction of the district court and the separate steps. And either one of those, either, if you affirm the district court's conclusion that it requires separate steps that can't happen simultaneously, that's a basis to affirm. They don't challenge literal infringement under that. Sanders is only applying one step, and it's a refold solution. And, or, if the court agrees that these have to be separate solutions, which the spec shows that they do, every example in the spec that gives the solutions gives separate solutions for washing and eluding, which makes perfect sense under the purpose of the steps in the claim because they do opposite things. And it's important to note that Amgen's proposals for both constructions of the washing step was adding a solution that does one thing, a function that does one thing, which was wash away the contaminants you don't want while preserving the binding of the protein. And then Amgen's solution of the second was adding a solution that does an opposite thing. It allows the protein to be released and captured. And those require two separate solutions. Nothing in the patent suggests you can do it with one solution. Certainly nothing in the patent suggests you can do it with the refold solution. And Sandoz's accused step is only continuously pumping refold solution onto the column. And those steps have to be taken in a certain order. Yes, Your Honor, they do. Because as the district court explained on A45, A46 of its claim construction order, for the reasons that you were reading, if you don't finish applying the washing solution, and so that is an unchallenged construction, it means adding a solution to do all those things. You finish that step, adding all the solution to wash, that washes away the contaminants. Is there any commingling of the solutions at any time during the phases? So the constructions and the claims don't talk about what's happening in the column. This is kind of like a red herring. The constructions that aren't challenged talk about what you're adding into the column. They focus on what you're adding into the column. And you're adding the washing solution first to do a certain thing. But the patent is a method of what happens in the column, correct? No, Your Honor. So if you look at the steps of Claim 7, which is the only claim on appeal, it's column 22 on page A77. If you look at the steps that are at issue, well, I think one thing, stepping back for a second, if you look at the steps, it's clear that each one of them must occur in this order, and they must occur separately.  Exactly, Your Honor. And it talks about expressing the protein first. That's step A. So you express the protein. Well, you don't want to break open, which is lysing, step B, the non-mammalian cell until you finish expressing the protein in step A. And then you can't solubilize the expressed protein until after you've lysed. So each step has to go in this order, Judge Rainier, and it has to be finished before the next step. And that's what the district court concluded. But then to your question directly, Judge Rainier, when you get down to E, F, and G, you're talking about a step that requires adding something in to the column, directly applying the refold solution to the matrix. It's not talking about what's happening. The method claimed, because it is a method claim, it's important about the how, is talking about what you're doing sort of at the top end of the column, as it were, not within the column. And what they're trying to focus on is really a red herring. There's no dispute that Sandoz only applies one solution to the column, and it's a refold solution. Tell us about 427. Well, the 427, Your Honor, disease-treating amount. They want to read disease-treating amount. They want you to read in the limitation from the first step into the disease-treating amount. But it says disease-treating, and he said to you today that the disease is cancer. So a disease-treating amount needs to be an amount of chemotherapy to treat the cancer. And certainly you can't, especially, excuse me, Your Honor. I understand the problem. We're allergic to the courtroom. A85, column 10, is where claim one is of the 427. And the first limitation is administering hematomatic, sorry about that, stem cell mobilizing effective amount, and they want this court to read stem cell mobilizing effective amount into disease-treating effective amount. Well, those are the two different words contrasted against each other in the same claim, and this court, that's just a bridge too far. His argument is that's one of the ways you treat the disease. I beg your pardon? His argument is that's one of the ways you treat the disease. Well, the district court interpreted the preamble, Your Honor, and they don't challenge the interpretation of the preamble. The preamble is limiting. The district court read a method of treating a disease. It's a method of treating cancer. And the district court found as fact, and that is on A26, note 3, the district court found as fact that the disease being treated in this patent is the underlying cancer, that the stem cell mobilization of this patent is not a disease-treating. In their reply brief, they cite their expert, but the district court credited our expert and found as fact that this is not. There are theoretically stem cell mobilizations that can actually treat an underlying disease. This does not. What you're doing here is trying to remove the stem cells from the body so that you can give the disease-treating amount of chemotherapy to treat the cancer and then put the stem cells back. Why does this argument matter in terms of infringement, which I gather they've conceded under this interpretation? They've conceded non-infringement. The stipulation doesn't clarify why. We think there are multiple reasons why we don't infringe. The record doesn't say why this matters. That's why I didn't realize. They conceded non-infringement under this interpretation, and the interpretation is clearly right because it says disease-treating amount. So it should be an amount of disease-treating chemotherapy. If the court has no further questions. Thank you, Ms. Maynard. Thank you. Mr. Broombridge has a couple of minutes for rebuttal. I will be brief, Your Honor, and I'll start with Your Honor's most recent question. Why does it matter? Because the construction says that the chemotherapeutic agent must be prescribed for treating the disease. Now, in the accused instrumentality, the chemotherapeutic agent would be prescribed for stem cell mobilization, not for treating the cancer. And the district court's construction reads that out. It reads out the very invention of the patent. And so if you have a situation where you do, you attempt to practice the invention of the 427 patent and say I'm going to use a chemotherapeutic agent as part of my mobilization regime, that's not covered by the patent under this construction. That's why we stipulate it's a non-infringement. And there was a second question. Ms. Maynard talked about why are two different terms used. For GCSF, it's hematopoietic stem cell mobilizing amount. And for the chemotherapeutic agent, it's disease-treating effective amount. The answer is because, as the patent teaches, some but not all chemotherapeutic agents were known to mobilize stem cells. Thus, for the ones that weren't so known, there would be no stem cell mobilizing amount. They would work in this method by assisting, for example, by helping the stem cells mobilizing by the GCSF to get out of the bone marrow so they could be harvested. But they would not themselves be mobilizing them. And that's why a different term is used. Lastly, with respect to the 878 patent, Ms. Maynard repeatedly said that the construction was adding a solution. And I think the reason she uses the word adding is because it implies pouring the thing in at the top. The word is applying a solution. The term, as construed at Appendix 48, is applying a solution. And the reason why that matters is because if we imagine any particular point in the column as the material is running down through those beads, it is being applied at that point. And therefore, it may seem like a slight semantic difference. In fact, in our view, it's very important that the construction of the district court, as proposed, was applying, not adding. And with that, unless there are further questions. Does it make any difference to you whether there's any type of commingling that happens during the two steps? To be clear, Your Honor, there is a mixing that occurs inside the column, which is the reason why the salt conditions change. This is, in essence, diffusion. You start off with a column that's full of liquid with no salt. And as you pour in this refold mixture, gradually the salt concentration rises. And the reason why that matters... And that causes the proteins to unbind. Exactly, Your Honor. The commingling piece that we care about is at the bottom. When the stuff comes out, we want to avoid commingling. So first of all, what emerges is the stuff we want to get rid of. And then after a certain point, what emerges is the stuff we want to keep. And that's exactly what happens. And that's what our expert testified to. Thank you, Counsel. Thank you to both. We'll take the case under advisement. Thank you, Your Honor. Thank you.